# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| ANNA JANUARY | * | CIVIL ACTION NO. 08-0785 |
| VERSUS | * | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Anna January, born April 20, 1971, filed applications for a period of disability and disability insurance benefits on February 16, 2006, alleging disability since October 28, 2002, due to orthopedic pain and depression.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Dr. Charles Olivier dated September 30, 2002 to August 26, 2005**. On September 30, 2002, claimant reported that she had fallen off the back of a truck onto her back while at work. (Tr. 159). X-rays were negative. The impression was thoracic lumbar strain. Dr. Olivier prescribed physical therapy and medication.

On December 6, 2002, claimant reported that her neck hurt more than her back. (Tr. 155). X-rays of the cervical spine were normal. (Tr. 156). The assessment was cervical thoracic and lumbar strain. (Tr. 155).

An MRI of the cervical spine taken on January 6, 2003, showed a mild annular bulge at C6-7, but was otherwise normal. (Tr. 152). A whole body bone scan dated February 20, 2003, was normal. (Tr. 149). An MRI of the thoracic spine taken on June 23, 2003, showed some changes at T5-6 and T 11-12 spondylosis. (Tr. 140, 142).

On July 3, 2003, claimant reported that she was still having trouble with her back. (Tr. 140). Dr. Olivier prescribed Lortab and trigger point injections. On August 26, 2003, claimant complained that the trigger point shots made her pain worse. (Tr. 139).

2

Claimant reported on April 26, 2004, that she was doing fair.  (Tr. 131).  She said that shots in her trapezius area had helped, but only for a few days.  Dr. Olivier recommended that she use her TENS unit on her neck and thoracic area, and prescribed Mobic 7.5, Flexeril 10 mg., and Talwin Nx.

On August 30, 2004, claimant complained of feeling "rotten."  (Tr. 128).  She had definite spasm on the left side of her neck.  Her lower back was really doing well. Dr. Olivier recommended injections and ice.  On October 29, 2004, claimant reported that the shot had helped her some.  (Tr. 126).

Claimant reported on January 20, 2005, that she was basically about the same. (Tr. 124).  An EMG nerve conduction test of the left upper extremity was completely negative.  Dr. Olivier's impression was cervical strain and resolving thoracic strain.

On August 26, 2005, claimant was not doing too well.  (Tr. 121).  She had recently settled her case with worker's comp.  She was very tearful in the office.  Dr. Olivier's impression was cervical and thoracic strain.

**(2) Records from Dr. Matthew Mitchell dated August 13, 2003 to February 21, 2006**.  On August 19, 2003, claimant complained of headaches, neck and shoulder pain.  (Tr. 255).  On examination, she had good range of motion in her neck and shoulders, and tenderness over her trapezius and levator scapula muscles.  (Tr. 256). Neurologically, she had good strength and sensation in her supper extremities, and

normal deep tendon reflexes.  The impression was spinal enthesopathy (spasm in the neck and upper shoulder area).  Dr. Mitchell performed trigger point injections.  (Tr. 257).

On September 17, 2003, claimant continued to complain of significant pain in her upper back and neck.  (Tr. 252).  On examination, she seemed extremely tender to light palpation, "perhaps overly tender for the amount of stimulation."  She also was very tender in the back, upper shoulders, and occiput.  She had decreased range of motion.

Dr. Mitchell's impression was spinal enthesopathy and possible secondary gain.  He prescribed Keto-flex gel for spasm, and an RS medical device to decrease spasms in her neck and shoulders.

On April 14, 2004, claimant complained of continued pain in her neck and shoulders.  (Tr. 245).  On examination, she had spasms of the upper border of the trapezius muscle.  Dr. Mitchell performed a trigger point injection, which gave her dramatic improvement.  (Tr. 246).

Claimant returned on July 8, 2004, with continued pain in her shoulders and under her shoulder blade.  (Tr. 240).  She had spasms in her trapezius and paraspinous muscles, and significant tenderness and spasm of the levator scapulae muscles.  The impression was degenerative disease of the cervical spine at C6-7, and significant

enthesopathy with secondary spasms of the muscles of the trapezius bilaterally and levator scapulae.  Dr. Mitchell changed her Flexeril to Soma, added Ambien for sleep, and performed injections.  (Tr. 240, 242).

On August 4, 2004, Dr. Mitchell performed a cervical epidural steroid injection.  (Tr. 237).  He repeated the injection on October 15, 2004.  (Tr. 229).  Following the injection, claimant had 100% pain relief in her neck.  (Tr. 230).

Claimant reported continued pain in her left shoulder and neck which radiated to her left hand on November 23, 2004.  (Tr. 222).  She had had good relief following her epidural injections, then her pain returned slowly over time.   Dr. Mitchell continued her medications, including Lortab, Ambien, Zanaflex, and Mobic.

A CT, after myelogram, showed significant degenerative changes of the facet joints.  (Tr. 211).  Dr. Mitchell opined that this certainly could be the underlying cause for her neck pain.  He performed a cervical medial branch nerve block to the facet joints at C4, 5, and 6 on February 22, 2005.

On March 30, 2005, claimant complained of severe headache, neck pain, and bilateral shoulder pain.  (Tr. 208).  She appeared in much distress, and was crying. Dr. Mitchell's assessment was cervical spondylosis – recent exacerbation.   He prescribed Percocet, Baclofen, Depo-Medrol, and Neurontin.

Claimant complained of pain in her head, neck, and shoulders on May 12, 2005. (Tr. 204). She reported 50% relief from her last facet injection, but was still having significant muscle spasms. She rated her pain as an 8 out of 10. The Depo Medrol injection at her last office visit had helped her neck pain signficantly.

On examination, claimant had spasms in the trapezius muscles, and decreased strength and sensation in the upper extremities. Dr. Mitchell's impression was occipital neuralgia, cervical degenerative disc disease, cervical spondylosis, and cervical spine enthesopathy. He refilled the Percocet, and ordered another injection of Depro Medrol IM.

On September 27, 2005, claimant complained that she was stressed from having 24 people in her house post-hurricane Rita. (Tr. 200). Dr. Mitchell noted that claimant's pain had been well-controlled on Toradol, and that Parafon Forte had been effective for muscle tension. He prescribed Clonazepam for short-term anxiety treatment and Toradol.

On November 28, 2005, Dr. Mitchell reported that an MRI of the cervical spine showed no nerve root compression. (Tr. 191). Claimant's lumbar MRI showed narrowing of the L4-5 foramen with a significant disc bulge at the L4-5 level. Claimant had cervical and lumbar steroid injections. The diagnosis was cervical and lumbar neuritis.

Claimant complained that she had been very anxious since the hurricanes, and had very limited ability to walk due to pain.  (Tr. 187).  She reported some improvement in pain, but worsening anxiety and headaches after the injection.  Dr. Mitchell prescribed MS Contin, Percocet, Cymbalta, and Clonazepam.  (Tr. 188).  The impression was cervical spondylosis, cervical radiculopathy, and thoracic back pain.

On February 1, 2006, claimant complained of headaches with back pain.  (Tr. 184).  She was in much distress.  She had had no relief from MS Contin, some relief of mood with Cymbalta, some pain relief with Percocet, and worsening headaches.  Dr. Mitchell discontinued the MS Contin, Cymbalta, and Toradol, and prescribed Percocet, Clonidine, and Lyrica.  (Tr. 185).

At her appointment on February 21, 2006, claimant complained of neck pain extending into her head and shoulders, and numbness at times in her arms.  (Tr. 182).  The Lyrica had helped her headaches significantly.  On examination, she had spasms in the trapezius muscle.  She had another epidural steroid injection, and was referred to a chiropractor for alignment, posture training, and muscle spasms treatment.

**(3) Residual Functional Capacity Assessment ("RFC") - Physical dated May 1, 2006**.  Dr. Henry Shoemaker found that claimant could lift 20 pounds occasionally and 10 pounds frequently.  (Tr. 276).  He determined that she could

7

stand/walk and sit for about 6 hours in an 8-hour workday.  He stated that she had unlimited ability to push and/or pull.

Claimant could frequently climb ramps/stairs and balance.  (Tr. 277).  She could never climb ladder/rope/scaffolds.  She could occasionally stoop, kneel, crouch, and crawl.  She was to avoid all exposure to hazards, such as machinery and heights.  (Tr. 279).  Based on her treating physician's concern that claimant was seeking secondary gain, Dr. Shoemaker found that her statements were at least partially credible.  (Tr. 280).

**(4) Records from Louisiana Pain Management dated April 3, 2006 to April 19, 2007**.[1]  On April 3, 2006, claimant complained of continued pain in her neck radiating into her upper shoulders and mid back.  (Tr. 349).  The last lumbar epidural injection had significantly helped her lower back pain.  She had another epidural injection of the cervical spine.

Dr. Amarendar Kasarla performed a cervical epidural steroid injection on July 12, 2006.  (Tr. 345).

---

[1]Claimant last met the insured status requirements of the Social Security Act on September 30, 2005.  (Tr. 27).  Because some of the medical reports were outside of claimant's date last insured, the ALJ found that they were not reflective of claimant's condition prior to September 30, 2005. (Tr. 30).

Claimant complained of jaw pain, bilateral shoulder pain, headaches, and bilateral numbness and tingling of the arms and hands on August 8, 2006.  (Tr. 342). On examination, she was sad and tearful.  Her prescriptions for Lyrica and Klonopin were increased,  Cymbalta was restarted, and Rozerem and Naproxen were added. (Tr. 343).

On October 13, 2006, claimant continued to have pain in her back and down her left leg.  (Tr. 336).  She had a lumbar epidural steroid injection.

Claimant returned on November 28, 2006, with continued back and neck pain. (Tr. 331).  She had returned to work at a candy shop in the mall because she had been unable to obtain disability.  Initially, she had had excellent relief after her injection, but her pain resumed after she was run off the road while driving.

On examination, claimant had significant paraspinous muscle tenderness and significant tenderness over her cervical spine.  She also had significant kyphosis, and some weakness in her left hand grip.  The impression was cervical paraspinous muscle spasm and lumbar disc bulge at L4-5.  She was given a Toradol injection, and prescribed OxyContin, Cymbalta, Lyrica, Clonazepam, and Rozerem.  (Tr. 332).  Dr. Mitchell encouraged her continued work.

On January 25, 2007, claimant complained of low back and shoulder pain.  (Tr. 326).  She was very tearful and depressed.  Her Cymbalta, Lyrica, and Oxycontin

9

were increased.  (Tr. 327).  She received a cervicothoracic injection on February 5, 2007.  (Tr. 321).

Claimant complained of mid-upper back pain on April 19, 2007.  (Tr. 285).  OxyContin was not helping.  She was tearful on examination.  Dr. Mitchell increased her Oxycontin and Baclofen, and prescribed Toradol, Tranxene, and Lunesta.  (Tr. 286).

**(5) Psychological Evaluation by Dr. Erick Cerwonka dated September 15, 2007**.  Claimant reported that she had been treated for depression and anxiety by her family doctor for about a year.  (Tr. 361).  She was taking Cymbalta, Clonazepam, Baclofen, Oxycodone, and Clonidine.

Claimant cried during some of the interview.  (Tr. 362).  Her mood appeared to be mildly to moderately depressed, and her affect was restricted and tearful.  She exhibited some signs of despair, helplessness, and hopelessness.  She said that she slept poorly, even with medication, and that her appetite was poor.  Her thinking was organized and goal-directed, with no evidence of loose associations, tangential, or circumstantial thought processes.

On examination, claimant was alert and oriented.  Her comprehension and fund of general knowledge was good.  Her remote memory was intact, and recent memory

was good.  Her attention and concentration was fairly good.  Her pace was fair, and persistence was good.  Insight appeared to be poor, and judgment was fair.

Claimant reported that she could stand for short periods, sit, walk short distances, do light lifting, and perform bathing, grooming, dressing, shopping, cooking, and household chores.  She said that she was able to drive and had a license. She stated that she was incapable of raising her arms above her head.

Administration of the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III"), revealed a verbal IQ score of 82, performance IQ of 90, and full-scale IQ of 85.  Dr. Cerwonka opined that these scores underestimated claimant's true intellectual functioning, due to her crying and variable concentration during testing. He estimated that her true full-scale score was likely to be in the average range at approximately 100, with verbal IQ at 100 and performance IQ at 101.

Administration of the MMPI-2 indicated that claimant produced a valid profile, but tended to over-report her symptoms. Dr. Cerwonka opined that it seemed to reflect a preoccupation with her physical and psychological problems.  Her validity profile suggested that she had chronic psychological problems and had adjusted to living with pathology.

Dr. Cerwonka's impression was depressive disorder, NOS (with some symptoms of anxiety), r/o schizotypal personality disorder, and average intellectual

functioning.  Claimant's Global Assessment of Functioning ("GAF") Score was 65. He noted that claimant had not seen a mental health provider.  He stated that treatment efficacy for this type of disorder tended to be very good, and that, therefore, this type of disorder would not be expected to prevent her from working.

Dr. Cervonka opined that claimant was possibly suffering from a personality disorder, such as schizotypal PD.  He noted that the test results had indicated that claimant had made significant use of somatization.  While this did not negate her physical complaints, it suggested that her experience of any physical problems was most likely impacted by this process.  (Tr. 384-85).  However, he stated that "[n]either a somatization process nor an Axis II Disorder would be expected to prevent her from working."  (Tr. 365).

As to intellectual and cognitive functioning, Dr. Cerwonka estimated that claimant functioned in the average range of measured intelligence, without significant cognitive deficit.  He noted that during the examination, she was able to sustain enough concentration and attention to perform both simple and more complex tasks. She also seemed able to relate well to others on a one-to-one basis.  He concluded that, as a result, barring any physical limitations, "there do not seem to be any cognitive, psychiatric, or behavioral problems that would prevent her from working on a regular basis."

In the Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Cerwonka found that claimant had no limitations on her activities. (Tr. 366-67).

**(6) Records from Lafayette Surgical Specialty hospital dated May 21, 2007 to August 3, 2007**. On August 3, 2007, claimant complained of continued neck pain which radiated into her shoulder. (Tr. 373). She also had pain in her lower back, and occasional numbness and weakness in the left leg. (Tr. 371).

On examination, claimant had some spasms of the trapezius and some tenderness of the lower back paraspinous muscles. She also had some numbness in her fingertips on the left, some decrease in strength in her left arm, and some weakness in her left leg. An MRI of the lumbar spine showed disc bulging and inferior foraminal narrowing at L4-5. The cervical spine MRI was within normal limits. The cervical myelogram followed by CT showed some arthritis at C4-5 and C5-6.

The impression was cervical radiculitis, cervical muscle spasms secondary to radiculitis, cervical facet syndrome, cervicalgia, and lumbar foraminal stenosis with intermittent radiculitis. She was prescribed Percocet and Clonidine, and received a cervical epidural steroid injection. (Tr. 371-73).

———

13

**(7) Claimant's Administrative Hearing Testimony**.  At the hearing on August 9, 2007, claimant was 36 years old.  (Tr. 395).  She testified that she was 5 feet 6 inches tall, and weighed about 185 pounds.  She stated that her weight had gone up by 45 pounds over the previous four or five years.  (Tr. 396).  She had completed high school in regular classes.  (Tr. 400).

Claimant testified that she had last worked in November of 2005 or 2006 as a cashier in a candy store at the mall.  (Tr. 396).  She stated that she had quit after a month because she could not sit or stand for long.  (Tr. 397).  Prior to that, she had worked at Linens 'n Things until she got hurt in 2002.  She reported that her worker's comp claim had settled for $5,000.

Additionally, claimant testified that she had worked as a substitute teacher, in a shoe department at the mall, at OfficeMax, and as a buyer for an oilfield company.  (Tr. 400-01).  She stated that she could drive.  (Tr. 400).

Regarding complaints, claimant testified that she had headaches, neck pain, shoulder pain, mid-back pain, numbness in her fingers, tingling in her arms, pain shooting from the back of her leg to her heels, insomnia, and anxiety.  (Tr. 401).  She stated that she was not going to a mental health clinic.  During the hearing, she reported having an anxiety attack.

Claimant also complained of constant, daily headaches.  She stated that she was taking Lyrica, which took away the tension, but not the headache.  (Tr. 402).  Additionally, she was taking Cymbalta for depression and Percocet for pain.  (Tr. 404).  She testified that she saw the doctor once every month or two.  She complained that she had relief from the injections initially, but that the pain had returned when they wore off.  (Tr. 403).

As to limitations, claimant reported that she could not even pick up her seven-pound puppy.  She stated that she stayed in bed in the dark because she could not stand the light with her headaches.  She said that she could not walk very far or sit very long.  (Tr. 405).  Additionally, she testified that she could not reach overhead.  (Tr. 409).

Regarding activities, claimant testified that the most she could do was wash dishes.  (Tr. 405).  She stated that she drove about once a week.  (Tr. 406).  She said that she could carry a loaf of bread from the grocery store.  She reported that she seldom used the computer.  (Tr. 407).

Additionally, claimant reported that her pain and depression were getting worse.  (Tr. 409-10).  She stated that she frequently forgot things, and had poor concentration.  (Tr. 410).  She said that she sometimes forgot to take her medicine.

She testified that her medication made her drowsy, but she was unable to sleep more than three or four hours at night.  (Tr. 411).

**(8) The ALJ's Findings**.   Claimant argues that: (1) the ALJ's residual functional capacity finding is not supported by substantial evidence; (2) the ALJ erred by exclusively relying on the Medical-Vocational Guidelines ("Guidelines") to deny benefits; (3) the ALJ failed to fully inform plaintiff that she had the right to request a supplemental hearing and the right to subpoena the post-hearing examining physician, and (4) the ALJ failed to fully and fairly develop the facts regarding her mental impairment, schizotypal personality disorder.

First, claimant contends that the ALJ's RFC assessment is not supported by substantial evidence. [rec. doc. 14, p. 4].  Specifically, she argues that the ALJ violated SSR 96-6p by disregarding state agency "expert opinion evidence" that claimant should avoid all exposure to hazards.  (Tr. 279).  She further asserts that this hazard restriction constitutes a non-exertional impairment which would preclude application of the Guidelines.

Social Security Ruling 96-6p provides as follows:

1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative

review.

2. Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.

Here, the ALJ stated that he was giving more weight to the state agency opinion "as it is more consistent with the evidence." (T. 31). However, he failed to mention Dr. Shoemaker's recommendation that claimant avoid all exposure to hazards, such as machinery and heights. (Tr. 279).

In response, the Commissioner argues that this restriction of working around hazards is a minimal restriction that does not significantly impact the available occupational base, citing SSR 85-15, which provides, in pertinent part, as follows:

A person may have the physical and mental capacity to perform certain functions in certain places, but to do so may aggravate his or her impairment(s) or subject the individual or others to the risk of bodily injury. Surroundings which an individual may need to avoid because of impairment include those involving extremes of temperature, noise, and vibration; recognized hazards such as unprotected elevations and dangerous moving machinery; and fumes, dust, and poor ventilation. A person with a seizure disorder who is *restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels*.

(emphasis added).

Here, claimant argues that the ALJ improperly relied on the Guidelines to conclude that she had the residual functional capacity to perform a full range of light

work because of her non-exertional limitation which restricted her from exposure to hazards.  However, the regulations provide that the ALJ may rely exclusively on the Guidelines in determining whether there is other work available that the claimant can perform when the characteristics of the claimant correspond to criteria in the Medical-Vocational Guidelines of the regulations, and that claimant either suffers only from exertional impairments or her *non-exertional impairments do not significantly affect [her] residual functional capacity*.  (emphasis added).  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569 and Part 404, Subpart P, Appendix 2, Section 200.00.  Where it is clear that the additional nonexertional limitation(s) has very little effect on the exertional occupational base, the ALJ may properly rely on the framework of the Guidelines to support a finding that the person is not disabled without consulting a vocational expert or other vocational resource.  SSR 83-14; *see also* SSR 83-12 (guidelines may be applied where "the restriction will be so slight that it would clearly have little effect on the occupational base").

Here, the Social Security Regulations indicate that a person who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels.  SSR 85-15.  Accordingly, the ALJ properly determined that claimant's non-exertional impairments did not significantly

18

affect her residual functional capacity.  (Tr.32).  He found that claimant met Rule 202.21 of the Medical-Vocational Guidelines, which directs a finding of not disabled for a claimant who is a younger individual and a high school graduate or more with skilled or semiskilled previous work experience.  20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.21.  As the claimant meets these criteria, the ALJ's reliance on the Medical-Vocational Guidelines is entitled to deference.

Next, claimant asserts that the ALJ failed to fully inform her that she had the right to request a supplemental hearing and the right to subpoena the post-hearing examining physician.  [rec. doc. 14, pp. 8-9].  It is well established that the ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).

The record reflects that the claimant was represented at the hearing by Gwen Edwards.  At the hearing, the ALJ advised claimant and her representative that he was sending claimant for a psychological consultative examination.  (Tr. 413).  By letter dated September 28, 2007, the ALJ sent a copy of Dr. Cerwonka's report to Ms. Edwards and advised her that:

> If you have any comments and/or objections regarding the proposed receipt of these exhibits into the records, please advise me within 10 days from the date of this letter.  Also, if you have any additional

evidence to submit, please submit it within this period of time.  If I do not hear from you within this time frame, I will assume you have nothing further to add and I will go ahead and issue a decision with what is in the record.

(Tr. 51).  The ALJ issued the decision on November 30, 2007.  (Tr. 33).

Claimant argues that the ALJ failed to fully inform her that she had the right to a supplemental hearing and the *absolute right* to subpoena Dr. Cerwonka. [rec. doc. 14, pp. 8-9] (*citing Tanner v. Secretary of Health and Human Services*, 932 F.2d 1110 (5th Cir. 1991), and *Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990).  In *Tanner*, the Fifth Circuit held that in the case of reports received after the close of the administrative hearing, a waiver of the right to cross-examine must be "clearly expressed or strongly implied" from the circumstances.  (internal citation omitted). *Id*. at 1113.  *Lidy* held that *by requesting a subpoena*, a claimant has the right to cross-examine an examining physician.  (emphasis added).  *See also* AR 91-1(5) ("when a claimant requests, prior to the closing of the record, that a subpoena be issued for the purpose of cross-examining an examining physician, the adjudicator must issue the subpoena").

Here, the ALJ gave claimant, through her representative, the opportunity to submit any comments or objections to Dr. Cerwonka's report.  (Tr. 51).  However, neither claimant or her representative responded to the letter from the ALJ.  In

addition, claimant did not request a subpoena for Dr. Cerwonka.  Accordingly, this argument lacks merit.

Finally, claimant argues that the ALJ failed to fully and fairly develop the facts regarding her schizotypal personality disorder. [rec. doc. 14, pp. 9-10].  Specifically, she asserts that the ALJ refused to follow Dr. Cerwonka's implicit recommendation for an evaluation to rule out schizotypal personality disorder.  [rec. doc. 14, p. 10].

However, Dr. Cerwonka did not recommend that further evaluation was necessary.  While he opined that it seemed possible that claimant was suffering from a personality disorder, such as schizotypal PD, he stated that "[n]either a somatization process nor an Axis II Disorder would be expected to prevent her from working." (Tr. 365).  He concluded that, as a result, barring any physical limitations, "there do not seem to be any cognitive, psychiatric, or behavioral problems that would prevent her from working on a regular basis."

In support of her argument that she was prejudiced by the ALJ's failure to develop the facts regarding her possible schizotypal personality disorder, claimant cites the report of Dr. Jerry Whiteman dated March 23, 2009. [rec. doc. 16, Appendix].  However this report is outside of claimant's date last insured, *i.e.*, September 30, 2005.  (Tr. 30).  Thus, this argument lacks merit.

21

Accordingly, I recommend that the Commissioner's decision be **AFFIRMED**, and that this matter be **DISMISSED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.**
***DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D**

**1415 (5TH CIR. 1996).**

Signed January 4, 2010, at Lafayette, Louisiana.

C. Michael Hill
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE